COMMERCIAL TRUST CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8760.   Promulgated October 31, 1927.

1. In the absence of evidence it is impossible to determine whether a reorganization of a railway corporation resulted in gain or loss.

2. A determination by the Commissioner of gain or loss arising from the sale of stock acquired in the reorganization of a corporation is sustained in the absence of evidence that error was committed.

3. The determination by the Commissioner of a loss arising from a sale of stock in 1921, which was acquired prior to March 1, 1913, is sustained in the absence of evidence of its value on the latter date.

*John K. Hulse, C. P. A.*, and *K. N. Parkinson, Esq.*, for the petitioner.

*C. C. Holmes, Esq.*, and *Philip M. Clark, Esq.*, for the respondent.

In this proceeding petitioner appeals from the determination by respondent of its income taxes for the years 1917, 1918, 1919, 1920, and 1921, as set forth in a notice dated September 5, 1925. In that notice respondent determined the following overassessments: for the year 1917, $5,060.12; for the year 1918, $3,845.67; and for the year 1919, $2,846.90, and the following deficiencies: for the year 1920, $14,995.41, and for the year 1921, $30,697.25.

Petitioner contends respondent erred (1) in refusing to permit the deduction of a loss of $106,929.50 incurred in 1917, by reason of the sale of 2,300 shares of the preferred stock of the Chicago, Rock Island & Pacific Railway Co.; (2) by refusing to permit petitioner to take as deductions in the years 1919, 1920, and 1921, rather than in the year 1917, certain losses arising from the reorganization of the Pere Marquette Railroad Co.; (3) that in event the Board holds that respondent did not err in attributing losses arising from such reorganization to the year 1917, then the respondent erred in computing the losses arising from sales made in 1919, 1920, and 1921 of securities acquired through such reorganization; (4) that respondent erred in computing a loss incurred in 1921 from the sale of bonds of the Chicago & Alton; (5) in computing a loss incurred in 1921 arising from the sale of preferred stock of the Consolidated Traction Co. of New Jersey, and (6) in computing a loss incurred in 1921 arising from the sale of bonds of the Portland Railway Light & Power Co.

Respondent, in his answer, admits error with respect to error (1) and at the hearing petitioner waived errors (5) and (6).

### FINDINGS OF FACT.

Petitioner is a corporation organized under the laws of the State of Pennsylvania and is engaged in the business of banking, handling trusts, and the buying and selling of securities.

In 1911, petitioner purchased $100,000 face value of collateral trust short-term 6 per cent notes, of the Pere Marquette Railroad Co., and paid therefor, in cash, $99,000.

On March 12, 1915, petitioner received as part payment for said collateral trust notes, $44,000 face value of refunding mortgage 4's of the same railroad, and on said date there was assessed against petitioner by the bondholders' committee, the sum of $5,340, which was paid by the petitioner.

On October 30, 1916, a reorganization agreement was entered into between certain parties termed " reorganization managers," and the holders of securities of the Pere Marquette Railroad Co. and other railroad lines of the Pere Marquette Railroad System. A plan of reorganization was made a part of the reorganization agreement. The material parts of the reorganization agreement read:

AGREEMENT, dated the 30th day of October, 1916, between J. & W. Seligman & Co., Robert Winthrop & Co., respectively copartnerships, and Eugene V. R. Thayer, hereinafter called the reorganization managers, parties of the first part, and HOLDERS OF THE SECURITIES hereinafter mentioned who shall become parties to this Agreement as hereinafter provided, their successors and assigns, and the HOLDERS OF CERTIFICATES OF DEPOSIT issued under or subject to the Plan, hereinafter collectively called Depositors, parties of the second part.

In consideration of the mutual benefits to be derived from the performance hereof and of the conditions and promises herein contained and for other valuable considerations, the parties hereto agree, each of the Depositors agreeing with each of the other Depositors, as follows:

First: The accompanying Plan is and shall be taken to be as a part of this Agreement with the same effect as though each and every provision thereof had been embodied herein and said Plan and this Agreement shall be read as parts of one and the same paper.

Second: The following bonds and coupons may be deposited under the Plan and this Agreement on the terms stated herein and in the Plan:

Flint & Pere Marquette Railroad Company, First Mortgage Six Per Cent Gold Bonds, with coupons maturing April 1, 1914, and subsequent coupons.

Flint & Pere Marquette Railroad Company, First Mortgage Four Per Cent Gold Bonds, with coupons maturing April 1, 1914, and subsequent coupons.

Flint & Pere Marquette Railroad Company (Toledo Division) First Mortgage Five Per Cent Gold Bonds, with coupons maturing July 1, 1914, and subsequent coupons.

Flint & Pere Marquette Railroad Company (Port Huron Division), First Mortgage Five Per Cent Gold Bonds, with coupons maturing April 1, 1914, and subsequent coupons.

Flint & Pere Marquette Railroad Company, First Consolidated Mortgage Five Per Cent Gold Bonds, with coupons maturing May 1, 1914, and subsequent coupons.

Chicago and West Michigan Railway Company, First Mortgage Five Per Cent Bonds, with coupons maturing June 1, 1914, and subsequent coupons.

Chicago & North Michigan Railroad Company, First Mortgage Five Per Cent Bonds, with coupons maturing May 1, 1914, and subsequent coupons.

Detroit, Grand Rapids & Western Railroad Company, First Consolidated Mortgage Four Per Cent Bonds, with coupons maturing April 1, 1914, and subsequent coupons.

Saginaw, Tuscola & Huron Railroad Company, First Mortgage Four Per Cent Gold Bonds, with coupons maturing August 1, 1914, and subsequent coupons.

Grand Rapids, Belding & Saginaw Railroad Company, First Mortgage Five Per Cent Gold Bonds, with coupons maturing March 1, 1914, and subsequent coupons.

Pere Marquette Railroad Company of Indiana, First Mortgage Four Per Cent Gold Bonds, with coupons maturing May 1, 1914, and subsequent coupons.

(The several kinds of bonds above enumerated are hereinafter collectively termed " Divisional Bonds.")

Pere Marquette Railroad Company, Consolidated Mortgage Four Per Cent Gold Bonds, with coupons maturing July 1, 1914, and subsequent coupons (herein termed " Consolidated Bonds.")

Pere Marquette Railroad Company, Refunding Mortgage Four Per Cent Gold Bonds, with coupons maturing July 1, 1914, and subsequent coupons (herein termed " Refunding Mortgage Bonds.")

Pere Marquette Railroad Company, Short Term Six Per Cent Notes dated February 9, 1912, and February 26, 1912, due October 8, 1912, in favor of Old Colony Trust Company, (herein termed " Old Colony Notes.")

. Detached Coupons due April 1, 1912, pertaining to Flint & Pere Marquette Railroad Company First Mortgage Six Per Cent Gold Bonds.

Detached Coupons due April 1, 1912, pertaining to Flint & Pere Marquette Railroad Company First Mortgage Four Per Cent Gold Bonds.

Detached Coupons due April 1, 1912, pertaining to Detroit, Grand Rapids & Western Railroad Company First Consolidated Mortgage Four Per Cent Gold Bonds.

Detached Coupons due July 1, 1912, January 1, 1913, July 1, 1913, and January 1, 1914, pertaining to Pere Marquette Railroad Company Refunding Mortgage. Bonds.

The following notes, debentures and stock may be deposited under the Plan and this Agreement on the terms stated herein and in the Plan in case the holders desire to accept the offer of the Purchase Syndicate referred to in the Plan and this Agreement:

Pere Marquette Railroad Company, Six Per Cent Collateral Trust Gold Notes (herein termed " Collateral Trust Notes "), with coupons maturing September 1, 1912, and subsequent coupons.

Pere Marquette Railroad Company, Six Per Cent, Five Year Gold Debentures (herein termed " debentures "), with coupons maturing July 1, 1912.

Pere Marquette Railroad Company, First Preferred Stock. Pere Marquette Railroad Company, Second Preferred Stock. Pere Marquette Railroad Company, Common Stock.

The Plan of Reorganization contains the following:

### NEW RAILROAD COMPANY

It is contemplated that the various properties will be sold under foreclosure of the Divisional Mortgages, the Consolidated Mortgage, the Refunding Mortgage, and the Improvement Mortgage, or any one or more of them and/or

under the general creditors' bill, or otherwise dealt with, and a new company or companies will be organized under the laws of such state or states as the Reorganization Managers in their discretion may determine.

The term "New Company" wherever used in this Plan or in the accompanying Agreement, is intended to mean such company or companies as the Reorganization Managers may determine to utilize for the purposes of the Plan. It is intended ultimately to vest in the New Company, free from prior mortgage lien, the lines of railroad now covered by the Divisional Mortgages, the Consolidated Mortgages, the Refunding Mortgage and Improvement Mortgage (excluding such lines or parts thereof or branches as the Reorganization Managers may determine that it is inexpedient to vest in the New Company), and, subject to the existing liens thereon (see page 26), all interests acquired in the reorganization in securities representative of the Canadian Lines. It is intended that as far as practicable the First Mortgage shall be a direct lien on physical properties, but in case delay should occur in acquiring any of the lines of railroad or branches, or if for any other cause the Reorganization Managers shall deem it advisable, the existing bonds upon such lines deposited under the Plan or other securities representative of such lines, may be pledged under the First Mortgage as security for the bonds issued thereunder.

It is contemplated that, as a consideration for the property to be conveyed and delivered to the New Company, or which it shall acquire pursuant to the Plan, the New Company shall deliver its bonds and stock, excepting any final amounts thereof as shall, in the discretion of the Reorganization Managers, be reserved for the future use of the New Company.

The collateral trust notes and refunding mortgage 4's held by petitioner were not included in the existing liens referred to on page 26 of the plan.

The new company, as above defined, was to be authorized to issue the following securities: First mortgage bonds, prior preference stock, preferred stock and common stock. The holders of refunding mortgage 4's of the Pere Marquette Railroad Co. were permitted to deposit their bonds and receive in exchange therefor, deposit certificates which would be exchangeable for common stock of the new company at $1,104 par value of stock for $1,000 face value of bonds.

The plan of reorganization provided for raising $16,000,000 to carry into effect the reorganization. There was to be formed a purchase syndicate which was to purchase for $16,000,000, the following securities of the new company: $6,000,000 first mortgage bonds; $11,200,000 prior preference stock (the whole issue) and $25,675,400 common stock. These securities were to be resold to the depositors of the securities of the Pere Marquette Railroad Co. and of the other lines of the Pere Marquette Railroad System, on the terms hereinafter stated.

The only rights which the holders of the collateral trust notes of the old company had under the plan were to purchase securities from the purchase syndicate. The following are the material parts of the plan of reorganization with reference to such rights of purchase:

The Purchase Syndicate hereinafter stated, having made the offer hereinafter set forth, HOLDERS OF COLLATERAL TRUST NOTES, DEBENTURES, FIRST PREFERRED

STOCK, SECOND PREFERRED STOCK and COMMON STOCK of Pere Marquette Railroad Company, accepting said offer and complying with the terms and conditions thereof as set forth in the Plan and Agreement, may, to the extent and on the terms hereinafter stated, acquire from the Purchase Syndicate 5% PRIOR PREFERENCE STOCK-CUMULATIVE (trust certificates), and COMMON STOCK (trust certificates) at the price and on the terms hereinafter prescribed (see page 19). Holders of said securities, in order to obtain such rights of purchase, must deposit the same with CENTRAL TRUST COMPANY OF NEW YORK, the Depositary for that purpose, on or before DECEMBER 4, 1916, and shall receive therefor certificates of deposit of said Depositary. At the time of deposit there must be paid for account of the Purchase Syndicate, in respect of each $1000 principal or par amount deposited, in the case of (a) COLLATERAL TRUST NOTES, the sum of $70; (b) DEBENTURES, the sum of $66.50; and (c) FIRST PREFERRED STOCK, SECOND PREFERRED STOCK and COMMON STOCK, the sum of $17.50; and at the same rates for other principal or par amounts. COLLATERAL TRUST NOTES must be accompanied by the coupons of September 1, 1912, and subsequent coupons and also the following securities to the extent respectively received by the holders thereof in the distribution of securities by the committee constituted under the agreement dated May 3, 1912, of holders of Collateral Trust Notes upon the termination of the affairs of said committee, viz: Participation Certificates of Bankers Trust Company, Depositary, for interests in Improvement Mortgage Bonds and Certificates of Interest of Bankers Trust Company, Depositary, for interests in Refunding Mortgage Bonds subject to prior lien of Equipment Trust Agreements. (See Note 2.) DEBENTURES must be accompanied by the coupons of July 1, 1912.

*    *    *    *    *    *    *

The Purchase Syndicate, on the terms and subject to the conditions herein stated, offers to the depositors of DIVISIONAL BONDS, CONSOLIDATED MORTGAGE BONDS, REFUNDING MORTGAGE BONDS, COLLATERAL TRUST NOTES, DEBENTURES, FIRST PREFERRED STOCK, SECOND PREFERRED STOCK and COMMON STOCK, the opportunity to acquire $11,200,000 5% Prior Preference Stock-Cumulative (trust certificates) and $22,400,000 Common Stock (trust certificates) at the following rate, viz:

   $1,000 par value Prior Preference Stock (trust certificates)
   $2,000 par value Common Stock (trust certificates) (for the sum of $975 in cash.)

This offer may be availed of in the manner herein provided by depositors of said securities up to any amount, but in case applications be made to acquire Prior Preference Stock (trust certificates) and Common Stock (trust certificates) in excess of the amounts offered, an allotment will, if applied for within the time limited and otherwise as provided in this Plan and the accompanying agreement, be made to the depositors of the following securities, to the extent indicated in the following table, and allotment will be made of any balance substantially in proportion to the additional amounts applied for.

*Table of minimum amount of new securities which may be acquired by depositors of each $1,000 principal or par amount of existing securities set forth.*

| Existing securities | Prior preference stock | Common stock | Cash payment |
|---|---|---|---|
| Refunding mortgage bonds | $250 | $500 | $243.75 |
| Collateral trust notes | 400 | 800 | 390.00 |
| Debentures | 380 | 760 | 370.50 |
| First preferred stock | 100 | 200 | 97.50 |
| Second preferred stock | 100 | 200 | 97.50 |
| Common stock | 100 | 200 | 97.50 |

The aforesaid offer of the Purchase Syndicate, if not availed of within the time limited or otherwise in accordance therewith as set forth in the Plan, is not open to acceptance by depositors under the Plan of securities of any class, and depositors of COLLATERAL TRUST NOTES, DEBENTURES and STOCK acquire no rights under the Plan other than such opportunity to acquire such new securities as they may obtain through the acceptance of said offer of the Purchase Syndicate, within the time limited, and upon compliance with the terms and conditions thereof.

Holders of certificates of deposit for REFUNDING MORTGAGE BONDS stamped as assenting to the Plan and Agreement, upon presentation thereof to Central Trust Company of New York before the close of business on DECEMBER 4, 1916, for appropriate stamping, and upon payment for account of the Purchase Syndicate at the rate of $43.75 for each $1,000 principal amount of Refunding Mortgage Bonds represented by their certificates of deposit (as a part of the required payments set forth in the table on page 19, of minimum amounts in respect of the securities therein designated), and depositors of COLLATERAL TRUST NOTES, DEBENTURES, FIRST PREFERRED STOCK, SECOND PREFERRED STOCK and COMMON STOCK who at the time of the deposit thereof shall have made the payments required by the plan (see page 7), will be entitled to receive SUBSCRIPTION WARRANTS specifying the minimum amount of new securities set forth in the foregoing table and shall also be entitled to receive APPLICATION CERTIFICATES. The amounts paid at the time of deposit of Collateral Trust Notes, Debentures, First Preferred Stock, Second Preferred Stock and Common Stock, will be taken as part of the required payments set forth in the foregoing table of minimum amounts in respect of the securities therein designated.

Holders of certificates of deposit for DIVISIONAL BONDS and CONSOLIDATED MORTGAGE BONDS stamped as assenting to the Plan and Agreement, upon presentation thereof to Central Trust Company of New York before the close of business on December 4, 1916, for appropriate stamping, will be entitled to receive APPLICATION CERTIFICATES only.

Attached to APPLICATION CERTIFICATES will be forms of application for subscription to Prior Preference Stock (trust certificates) and Common Stock (trust certificates) at the prescribed rate, which forms must be properly filled out, signed, detached and filed with Central Trust Company of New York before the close of business on DECEMBER 18, 1916, and must be accompanied by a payment in cash equal in amount to $17.50 in respect of each share of Prior Preference Stock applied for. APPLICATION CERTIFICATES in case of allotment, and as soon as practicable thereafter, will be exchangeable for SUBSCRIPTION WARRANTS. The cash accompanying applications exceeding in amount of $17.50 in respect of each share of new Prior Preference Stock (trust certificates) allotted will be returned (but without interest) to registered holders of Application Certificates at the time of the exchange thereof for Subscription Warrants.

SUBSCRIPTION WARRANTS will be issued in two series, SERIES A and SERIES B, and will acknowledge the receipt of an amount equal to $17.50 in respect of each share of new Prior Preference Stock therein specified.

On the consummation of the reorganization the registered holders of SUBSCRIPTION WARRANTS, SERIES A, will be entitled to exchange the same for PURCHASE WARRANTS.

The registered holders of SUBSCRIPTION WARRANTS, SERIES B, on the consummation of the reorganization, will be entitled to the delivery of the Prior Preference Stock (trust certificates) and Common Stock (trust certificates) to the amount therein specified upon making payment in cash of an amount

equal to $80 (being balance of cost) in respect of each share of the new Prior Preference Stock specified in such SUBSCRIPTION WARRANTS, SERIES B. Failure to make such payment at the time fixed by the Reorganization Managers will forfeit all rights to purchase such stock trust certificates and all rights of purchase under the Plan, and the Subscription Warrants, Series B, in respect of which such failure shall be made, will forthwith become void.

At the time of making the required payments to obtain Subscription Warrants, depositors must respectively elect whether the Subscription Warrants shall be of Series A or Series B, and the registered holders of Application Certificates must similarly elect at the time of filing their application forms.

PURCHASE WARRANTS will be issued by Guaranty Trust Company of New York, and will be delivered on behalf of the Purchase Syndicate. The Purchase Warrants will specify the amounts of Prior Preference Stock and Common Stock specified in the corresponding Subscription Warrants Series A surrendered therefor, and will certify that on payment on the date therein specified, which is to be the date of maturity of the loan to be made by the Loan Syndicate (see page 23) of the sums specified in such Purchase Warrants, which shall be at the rate of $80 in respect of each share of Prior Preference Stock therein specified (being balance of cost) said Trust Company, on surrender of such Purchase Warrants, will deliver to the registered holders thereof the Prior Preference Stock (trust certificates) and Common Stock (trust certificates) therein specified, or will in lieu of the delivery of any part or all of such Prior Preference Stock (trust certificates) pay in cash at 70 per cent flat for Prior Preference Stock (trust certificates) or fractional interests not delivered. Holders of Purchase Warrants will not be entitled to dividends received in respect of the stock therein specified.

Failure to pay the sums payable as specified in the Purchase Warrants when due will forfeit all rights in respect of stock (trust certificates) specified in the Purchase Warrants and all rights under the Purchase Warrants, and the Purchase Warrants in respect of which such failure shall be made, will forthwith become void.

For fractional interests in stock (trust certificates) deliverable under Purchase Warrants or Subscription Warrants Series B script may be delivered.

\*          \*          \*          \*          \*          \*          \*

During December 1916, petitioner paid the Central Union Trust Company of New York, $122.50 in cash and deposited the $100,000 face value of collateral trust notes and $44,000 face value of refunding mortgage bonds which were acquired as heretofore stated. On April 28, 1917, petitioner paid a further sum of $41,435.78. On April 28, 1917, petitioner received 510.9472 shares of prior preference stock in the new company (it having received prior thereto 7 shares of the same stock,) and 1,617.3423 shares of common stock in the same company.

On December 5, 1917, petitioner paid $8,941.58 which was its share of an assessment for the expenses of the bondholders' committee.

In December 1916, both classes of stock were traded in on exchange on the basis of " when, if and as issued." In that month, the common stock sold at 38⅛ high and 29 low. The prior preference stock sold in that month at 74½ high and 70 low. The high prices

were when first traded in and the prices of both issues gradually receded through the years 1917 and 1918.

In 1919, petitioner sold 1,600 shares of the common stock for $39,371. In 1920, it sold 17.3423 shares of common for $516.70. In 1921, it sold 517.9472 shares of prior preference stock for $28,672.36.

Respondent determined that the transactions whereby petitioner acquired the common stock of the new company in exchange for its refunding mortgage bonds and by purchase, and acquired its prior preference stock by purchase in the exercise of its rights under the plan, resulted in a loss to petitioner in 1917 of $84,429.42; that petitioner made the following gains from its sale of common stock to wit: $2,571 in 1919 and $117.83 in 1920; and that it incurred in 1921 a loss of $4,539.21 from its sale of prior preference stock. In computing petitioner's losses for 1917 and 1921, and its gains for 1919 and 1920, respondent valued the prior preference stock at $65 per share and the common stock at $23 per share as of date of acquisition.

In the year 1921, petitioner sold 102M Chicago and Alton Refunding 3's for $46,027.50. These securities cost petitioner in 1909, $68,850.00.

OPINION.

MILLIKEN: The respondent has determined overassessments for the years 1917, 1918, and 1919. Since these overassessments did not result upon the denial of a claim in abatement, the Board is without jurisdiction in this proceeding insofar as it relates to these years, and this appeal, insofar as it involves the taxes for these years, is dismissed. *Appeal of Cornelius Cotton Mills*, 4 B. T. A. 255. We have, however, the right to determine the facts relating to the transactions in these years or in prior years insofar as such facts affect the deficiencies of the years 1920 and 1921.

The burden of proof rests on petitioner, and, therefore, it was incumbent on it to introduce evidence sufficient to show that respondent erred. This evidence must be competent evidence. The only evidence introduced by the petitioner at the hearing was a printed copy of the agreement of reorganization and the accompanying plan of reorganization of the Pere Marquette Railroad Co.; a pamphlet entitled "Investor's Pocket Manual"; testimony that this book and another entitled "Standard Statistics" are used and relied upon in the banking and security trading world; and a proposed stipulation of facts. This stipulation gives the authority for each statement of fact contained therein. Thus it states "That as of October 30, 1916, there was issued a plan for the reorganization of the company (Pere Marquette Rail*road* Company, a corporation of

the States of Michigan and Indiana) to form the present Pere Marquette Rail*way* Company, under the laws of Michigan," and cites as authority for this statement Standard Statistics. The stipulation makes reference to judicial sales, to orders of courts and findings of state commerce commissions and gives the same authority for each statement. Respondent at the hearing admitted that the book in question contains such statements but objected to their admission on the ground that such statements were incompetent to prove the facts in issue. The fact of the incorporation of both the old and new corporations was material and especially was the fact whether the new company was incorporated under the laws of the same State in which the old corporation was organized. See *Marr* v. *United States*, 236 U. S. 536; 5 Am. Fed. Tax Rep. 5393.

No authority has been cited and in our research we have found none which permits the proof of incorporation, of an order of court or of an order of a state commission by statements in trade publications, it matters not how trustworthy such publication may be. It is true, that in a few cases, among which are prices paid and pedigree, trade publications whose integrity have been proven, have been admitted in evidence. In section 1702 of Wigmore on Evidence, the general rule relative to the admission of this secondary evidence is thus stated:

In a few narrow and usually well-defined classes of cases, recognition has been given, by way of exception to the Hearsay rule, to certain commercial and professional lists, registers, and reports. Their admissibility in some instances is placed upon judicial principle, in others arises solely from statutory innovation; but in most of the classes statute has carried out hints originally given judicially.

The necessity in all of these cases lies in part on the usual inaccessibility of the authors, compilers, or publishers in other jurisdictions; but chiefly in the great practical inconvenience that would be caused if the law required the summoning of each individual whose personal knowledge has gone to make up the final result. The necessity therefore is of the sort that is recognized in the preceding two Exceptions, i. e. a practical inconvenience existing generally for the statements as a class; and hence it is not required that the death, insanity, absence from the jurisdiction, or the like, of the author shall be shown before the statement can be used.

We are of the opinion that we should not extend the exception to the hearsay rule beyond the adjudged cases, especially as the necessity, which is the foundation of this exception, is not present in this case. Certified copies of the articles of incorporation, of the orders of the court, and of the order of the state commerce commission could have been easily obtained.

Admitting for the purpose of this opinion that there was but one new corporation and that such entity was in fact incorporated, and that such incorporation was pursuant to the plan of reorganization,

the copy of which is in evidence, it does not follow that we should hold that respondent erred in determining that the reorganization of the Pere Marquette Railroad Co. was a completed transaction resulting in a deductible loss sustained at the time the reorganization was effected.

Petitioner held bonds and notes of the Pere Marquette Railroad Co. After the reorganization it held prior preference stock and common stock of the new company, some of which it acquired in exchange for bonds and the larger part of which it acquired from the purchase syndicate for cash. The rights which petitioner possessed by reason of the ownership of the bonds and notes of the old company were materially different from its rights under the stock of the new company which it acquired. In *Appeal of A. J. Siegel*, 4 B. T. A. 186, we had before us the question whether taxable gain resulted to certain stockholders on the merger of three national banks. We there said:

The two most recent decisions of the Supreme Court which appear to have a bearing upon the case are *Weiss* v. *Stearn*, 265 U. S. 242, and *Marr* v. *United States*, 268 U. S. 536. Both of these arose out of reorganizations by which the assets of a corporation were transferred intact to a new corporation. In *Weiss* v. *Stearn*, it was held that no taxable transaction took place. In the course of its opinion the court says:

"We cannot conclude that mere change for purposes of reorganization in the technical ownership of an enterprise, under circumstances like those here disclosed, followed by issuance of new certificates, constitutes gain separated from the original capital interest. Something more is necessary—something which gives the stockholder a thing really different from what he theretofore had."

In *Marr* v. *United States*, the court, holding that a taxable transaction resulted from the reorganization under consideration, said:

"In *Weiss* v. *Stearn*, as in *Eisner* v. *Macomber*, the transaction was considered, in essence, an exchange of certificates representing the same interest, not an exchange of interests.

"In the case at bar the new corporation is essentially different from the old."

Considering these two decisions, it appears that the determining point is not whether the corporate existence continues, but whether the interest of the stockholder changes. In the instant case the interests of the stockholder before the merger and after the merger differed more radically than did the interests of the stockholders in *Marr* v. *United States*. What the taxpayer now has is essentially different from that which he had and an exchange has taken place which is properly subject to tax.

In the above proceeding the stockholders of the old company remained stockholders in the merged institution. Here the petitioner, which was a creditor of the Pere Marquette Railroad Co., did not become a creditor of the new company but a stockholder therein. Respondent did not err in determining that the reorganization proceedings constituted, insofar as petitioner is concerned, a closed

transaction which resulted at the time the reorganization was completed in a deductible loss.

This leaves open petitioner's alternative complaint to the effect that respondent erred in computing the gain and loss resulting from the sale of its stock in 1920 and 1921. The only error which petitioner now insists upon is that respondent, for the purpose of computing petitioner's loss in 1917, and in this way fixing the basis for future gain and loss, valued the prior preference stock at $65 per share and the common stock at $23 per share, whereas petitioner asserts that the prior preference stock was worth $74.50 a share and the common stock $38.12½ a share.

It is to be observed that respondent determined these valuations as of the year 1917, while the values given in evidence for petitioner were the high and low prices for December, 1916. Petitioner has not shown that respondent erred in treating the reorganization as a closed and completed transaction in the year 1917. It is not shown when the new company was reorganized.

In fact, the copy of Investor's Pocket Manual filed in evidence indicates that the new company was organized in March, 1917. We refer to this publication merely for the purpose of pointing out that petitioner has not brought into the record any evidence as to when the prospective plan of October 30, 1916, was carried into effect or when the new corporation proposed by that plan was in fact organized. Much less has it shown that these things occurred in the year 1916. Petitioner acquired all its prior preference stock and, it appears, a large amount of its common stock by purchase and the remainder of its common stock by exchange for its refunding mortgage 4's. There could have been no completed transaction until the new company was organized and capable of issuing the stock. Since petitioner has failed to show that respondent was in error in determining that the transaction was closed and completed in 1917, and since we have no evidence before us other than the findings of the Commissioner as to the value of the common and prior preference stock in that year, we can not hold that respondent erred in his determination of petitioner's gain and loss resulting from sales made in 1920 and 1921.

The only remaining question is whether respondent erred in the determination of petitioner's losses in 1921 arising from its sale of bonds of the Chicago & Alton. Petitioner introduced no evidence on this issue. While its counsel, in his opening statement quoted prices bid and asked on March 1, 1913, from Standard Statistics, it did not introduce that publication in evidence, neither did it introduce the testimony of any witnesses relative thereto. The March 1, 1913, value is absent. Without this information we can not deter-

mine petitioner's deductible loss.   See *Chas. H. Sachs*, 6 B. T. A. 68; *J. W. Kelly*, 6 B. T. A. 1221.

In petition filed it is alleged that the bonds when purchased in 1909 cost petitioner $80,070.   This averment is denied in the answer of respondent in the following words, " but denies that the cost of said bonds was $80,070 or any sum in excess of $68,850.00."   Petitioner introduced no evidence to support the averment that the bonds cost $80,070 or any other sum.

*Judgment will be entered for the respondent.*

Considered by MARQUETTE, PHILLIPS, and VAN FOSSAN.